# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

| | |
|---|---|
| Curtis N. Eddy, | Civ. No. 12-65 (PJS/JJK) |
| Plaintiff, | |
| v. | **REPORT AND** |
| | **RECOMMENDATION** |
| Michael Astrue, Commissioner of Social Security, | |
| Defendant. | |

_____

Gerald S. Weinrich, Esq., Weinrich Law Office, counsel for Plaintiff.

David W. Fuller, Esq., Assistant United States Attorney, counsel for Defendant.

_____

JEFFERY J. KEYES, United States Magistrate Judge

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), Plaintiff Curtis Newell Eddy seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"), who denied Plaintiff's application for disability insurance benefits. The parties have filed cross-motions for summary judgment. (Doc. Nos. 8, 13.) This matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1. For the reasons stated below, this Court recommends that Plaintiff's motion be denied and Defendant's motion be granted.

## BACKGROUND

### I.    Procedural History

Plaintiff filed an application for disability insurance benefits on August 15, 2008, alleging a disability onset date of April 15, 2006.  (Tr. 131–34, 138, 204.) The Social Security Administration ("SSA") denied Plaintiff's claim initially on September 24, 2008 (Tr. 57), and again upon reconsideration on October 10, 2008.  (Tr. 59.)  Plaintiff then filed a written request for hearing before an Administrative Law Judge ("ALJ").  (*See* Tr. 73–74.)  The ALJ conducted a hearing, at which Plaintiff appeared and testified, on April 14, 2010.  (Tr. 22–56.) On August 4, 2010, the ALJ issued an unfavorable decision on Plaintiff's application.  (Tr. 11–18.)  Plaintiff filed a timely request for review.  (Tr. 6.)  On December 20, 2011, the Appeals Council denied Plaintiff's request (Tr. 1–4), thereby making the ALJ's decision the final decision of the Commissioner.  *See* 20 C.F.R. § 404.981, 416.1481.

Plaintiff filed this action on January 9, 2012, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). (Doc. No. 1.)  Pursuant to D. Minn. LR 7.2, the parties have cross-moved for summary judgment.  (Doc. Nos. 8, 13.)

## II.    Medical Background

As of April 15, 2006, the date of Plaintiff's alleged onset of injury, Plaintiff was forty-one years old.  (Tr. 16.)  He has a high school education and past relevant work as a production welder, well driller, and welder/assembler.  (Tr. 16, 262.)

On December 18, 2002, Plaintiff was seen by Dr. Bret A. Ancowitz, a physician at the Mayo Clinic, with chronic back pain and right leg pain.  (Tr. 337–38.)  Dr. Ancowiz noted Plaintiff's past medical history "of structural impingement of the right L4, right L5, and bilateral S1 nerve roots on prior MRIs . . . ."  (Tr. 337.)  Plaintiff reported that he had been doing well after he received a spinal steroid injection for the above-named impingement, however, an onset of new acute low back pain occurred after he lifted a pipe off a truck six months before.  (*Id.*)

On January 6, 2003, Plaintiff underwent an MRI scan of the lumbar spine at the Mayo Clinic.  (Tr. 314.)  The results from that exam showed a right-sided disc protrusion at the L3-4 level, a smaller right-sided disk protrusion at the L4-S level, and a stable disc protrusion at the LS-S1 level.  (*Id.*)  The lower spinal cord appeared normal, and the remainder of the lumbar spinal canal and neural foramina were "well-maintained."  (*Id.*)

At Plaintiff's visit with Dr. Brian E. Grogg, a physician at the Mayo Clinic Spine Center, on January 21, 2003, he "was doing well after physical therapy and use of Darvocet."  (Tr. 332.)  At that time, he was dismissed from the Spine

Center.  (*Id.*)  Approximately two weeks later, Plaintiff saw Dr. Grogg again for a follow-up.  (*Id.*)  The records from that appointment indicate that Plaintiff believed he had "responded to epidermal corticosteroid injections in the past."  (*Id.*)

Plaintiff was seen again by Dr. Grogg on February 6, 2004.  Plaintiff reported that he had significant continuous aching and sharp discomfort in his right buttock, lateral thigh, and lateral leg.  (*Id.*)  The discomfort and paresthesia[1] occasionally went into Plaintiff's foot in a vague distribution.  (*Id.*)  Plaintiff was unsure if there was weakness.  (*Id.*)  Plaintiff reported that he could be awakened by the pain, but there was no change in his bladder or bowel function.  (*Id.*)  The most frustrating activities for Plaintiff were sitting and driving, but standing and walking were not as "troublesome."  (*Id.*)  Dr. Grogg noted that Plaintiff's physical examination showed borderline mild weakness of the right ankle but otherwise strength was intact.  (*Id.*)  In addition, the range of motion of the lumbar side did not provoke symptoms, but the motion was guarded and limited.  (*Id.*)  And straight leg raising reproduced Plaintiff's symptoms on the right.  (*Id.*)

On March 9, 2004, Plaintiff returned to the Mayo Clinic Spine Center for an assessment by Dr. Grogg.  (Tr. 329.)  Plaintiff's chronic episodic low back and right lower limb pain had been exacerbated in the past few months.  (*Id.*)  Plaintiff reported pain in the low back region diffusely with radiation to the posteriorly

---

[1]     Paresthesia refers to an abnormal sensation of the body, such as prickling, tingling, or burning.  *Paresthesia*, MDGuidelines, http://www.mdguidelines.com/ paresthesia/definition (last visited Dec. 12, 2012).

lateral leg, posteriorly lateral thigh, and right buttock. (*Id.*) Sitting and lying down aggravated the pain. (*Id.*) Sitting for a long period of time also caused numbness and tingling in a similar distribution. (*Id.*) Dr. Grogg observed no definite weakness, and no change in bowel or bladder function. (*Id.*)

On March 23, 2004, Plaintiff underwent a right L4-5 partial laminectomy and diskectomy for his right lower extremity pain. (Tr. 315–16.) Dr. John Atkinson, the Mayo Clinic physician who performed the procedures, noted that treatment options were discussed with Plaintiff after review of his MRI revealed an extruded L4-5 disk, and Plaintiff elected to proceed with surgery. (*Id.*)

On August 1, 2005, well over a year later, Plaintiff was examined by Michael D. Olson, a Mayo Clinic Emergency Medicine physician's assistant. (Tr. 320.) The record from that visit indicated that Plaintiff "complains of pain in his right buttock radiating down his left leg and to the left calf and occasionally to the left lateral foot. He has a history of disc disease and laminectomy in the past, and these are similar symptoms to what he has had before." (*Id.*) The diagnosis from the visit was acute radicular low back pain, and Plaintiff was dismissed with a prescription for Naproson, Flexeril, and Percocet. (*Id.*)

On August 8, 2005, Plaintiff was seen for a follow-up visit with Dr. Grogg. (Tr. 325.) Plaintiff reported that after his back surgery in March 2004, he was essentially pain free until approximately two months prior to August 8, 2005. (*Id.*) At that time, he experienced back discomfort and back spasms. (*Id.*) Plaintiff's pain and discomfort responded to resuming back exercises as well as swimming.

5

(*Id.*)  However, when twisting while removing a cap on a pipe he experienced severe right lower limb pain that has remained stable.  (*Id.*)  The pain ranged in intensity from three to ten out of ten.  (*Id.*)  Plaintiff's pain was worse with sitting and walking, and he reported no comfortable position.  (*Id.*)  Plaintiff denied any bowel or bladder changes, and he also denied any weakness.  (*Id.*)  Additionally, Plaintiff experienced minimal to no paraethesia.  (*Id.*)  A physical exam revealed pain in the right lower limb and low back with flexion greater than extension of the lumbar spine.  (*Id.*)  There was also mild palpatory tenderness over the right posterior superior iliac spine region.  (*Id.*)

On August 8, 2005, Plaintiff underwent another MRI of the lumbar spine at the Mayo Clinic.  (Tr. 313.)  The MRI scan revealed a right L3-4 disk extrusion with inferior migration possibly affecting the L4 and L5 nerve root.  (Tr. 324.)  After the MRI scan, Plaintiff saw Dr. Grogg on August 16, 2005 for a follow-up.  (*Id.*)  Since Plaintiff wanted to avoid a second lumbar surgery, Dr. Grogg recommended Plaintiff take Ultram for pain control during the day, continue Percocet for evening pain control, and try an epidural steroid injection under fluoroscopic guidance.[2]  (*Id.*)  Thereafter, Plaintiff received epidural steroid injections on August 18, 2005 and September 2, 2005.  (Tr. 282, 323.)

---

[2]  Fluoroscopy is an x-ray procedure that makes it possible to view a person's internal organs and decide the appropriate placement of an injection. *Definition of Fluoroscopy*, MedicineNet.com, http://www.medterms.com/script/ main/art.asp?articlekey=3488 (last visited December 14, 2012); *Fluoroscopic*

(Footnote Continued on Next Page)

On May 12, 2006, Plaintiff received a third epidural steroid injection. (Tr. 282.)[3] And in early June 2006, Plaintiff saw Dr. Grogg regarding a "nearly constant deep ache" in his posterior thigh and calf and right buttock, which could reach a pain level of four to five out of a scale of one to ten. (*Id.*) Plaintiff reported that the pain worsened with bending, sitting, and prolonged walking, but changing positions usually helped. (*Id.*) On examination, Dr. Grogg found that while Plaintiff had a reduced reflex of his right calf muscle, there were no definite strength deficits. (*Id.*) Dr. Grogg also noted that lumbar spine flexion worsened Plaintiff's back and leg symptoms, but extension appeared to improve his symptoms. (*Id.*) Dr. Grogg recommended a repeat MRI, the pain medication Neurontin, physical therapy, and continued use of Plaintiff's other pain medications. (*Id.*)

Plaintiff underwent a MRI of his lumbar spine the next day. (Tr. 278.) The MRI results showed mild enhancing epidermal granulation tissue at L4-5, and a large disk extrusion at L5-S1. (*Id.*) The remainder of the examination was unremarkable. (*Id.*) Five days later, Plaintiff saw Jay C. Goetting, a physical

_____

(Footnote Continued from Previous Page)
*Injections for Chronic Spine, Leg and Arm Pain*, Tri Rivers Surgical Associates, Inc., http://www.tririversortho.com/uploaded/pdf/125626_Fluoroscopic%20Fact%20Sheet.pdf (last visited December 14, 2012).

[3]     Plaintiff worked after April 15, 2006, the alleged disability onset date, however, it was an unsuccessful work attempt. (Tr. 12.) Plaintiff worked as a janitor temporarily, a part-time position, which did not amount to substantial gainful activity. (*Id.*)

therapist at the Mayo Clinic. (Tr. 15, 291.) Given Plaintiff's difficulties with exercise, Dr. Goetting suggested a trial of traction.[4] (*Id.*)

The following day, Plaintiff returned to see Dr. Grogg to review his MRI results. (Tr. 283.) Dr. Grogg noted that the enhancing granulation tissue around the right L5 nerve root and the disc herniation eccentric to the right L5-S1 level could affect the L5 and S1 nerve roots. (*Id.*) Plaintiff reported that the Neurontin he was taking was helping; he was feeling better, with marked improvement in his lower limb pain. (*Id.*) However, in light of the MRI findings, Dr. Grogg recommended that Plaintiff see Dr. Atkinson, a neurosurgeon at the Mayo Clinic. (*Id.*)

In late June 2006, Plaintiff saw Dr. Atkinson for a consultative examination. (Tr. 288–89.) Dr. Atkinson stated that he knew Plaintiff from his previous right L4-5 laminectomy and diskectomy, which was performed in 2004. (Tr. 288.) Dr. Atkinson noted that Plaintiff had a large extruded superiorly migrated L5 disc, which was the level below the previous surgery and accounted for Plaintiff's current pain complaints. (Tr. 15, 288.) Dr. Atkinson noted that Plaintiff reported his pain began on April 20, 2006, at which time he reported a pain level of ten out of ten, but at the present time his pain was at a level two out of ten. (Tr. 288.) While Plaintiff reported some static numbness in his right leg in his superior

---

[4]     Traction is a therapeutic way to ease pain by extending and realigning the spine. *Traction Definition*, Spine-Health, http://www.spine-health.com/glossary/t /traction (last visited Dec. 17, 2012).

lateral calf, and ongoing back pain for ten years, he was doing reasonably well. (Tr. 15, 288.) Dr. Atkinson recommended that Plaintiff keep his weight down, stop smoking, and change his job to a more sedentary one since he was working as a welder using a crane. (*Id.*) Dr. Atkinson gave Plaintiff a work excuse to return to work after the Fourth of July holiday, with restrictions on lifting, stooping, kneeling, or bending. (Tr. 288.)

After a one-year-and-eight-month period of not seeking treatment, in early February 2008, Plaintiff returned to see Dr. Grogg for his back and leg pain. (Tr. 284.) Dr. Grogg noted that since he last saw Plaintiff in June 2006, Plaintiff reported that he had persisting problems, although at times he believed he was near normal. (*Id.*) Plaintiff reported that his pain could reach intensities of up to a level six out of ten, and he reported that while he had not been working, he went back to school but had difficulty carrying his books. (*Id.*) Dr. Grogg noted that Plaintiff was not taking any medications and had not had recent physical therapy. (*Id.*) On examination, Dr. Grogg observed that Plaintiff had asymmetric reflex of the calf muscle at -1 on the right compared to 0 on the left; however, his quadriceps reflex was physiologic and symmetric. (*Id.*) Dr. Grogg recommended that Plaintiff undergo an updated MRI of his lumbar spine. (*Id.*)

The next day, Plaintiff underwent an MRI of his lumbar spine. (Tr. 278.) The MRI results revealed interval change since Plaintiff's prior evaluation dated June 2, 2006, and possible neural compromise of the right S1 nerve root. (*Id.*)

The MRI also showed post-surgical changes of the right hemilaminectomy[5] at L4-5 and loss of disk heights at L3-4 through L5-S1.  (*Id.*)  The remainder of the examination appeared unremarkable.  (*Id.*)

One week later, in mid-February 2008, Plaintiff saw Dr. Grogg to discuss his most recent MRI results.  (Tr. 286.)  Dr. Grogg explained that the MRI scan showed that Plaintiff's condition was "much improved from June 2006."  (Tr. 15, 286.)  Plaintiff reported waxing and waning right lower limb symptoms around the L5-S1 area, which Dr. Grogg indicated could be from chronic nerve root pain, but successful surgical intervention appeared unlikely.  (*Id.*)  Dr. Grogg supported Plaintiff's desire to speak with a neurosurgeon to confirm Dr. Grogg's impression about the unlikely success of surgical intervention.  (Tr. 286.)  Dr. Grogg also recommended that Plaintiff initiate physical therapy with a lumbar stabilization program.  (Tr. 15, 286.)  Plaintiff refrained from Dr. Grogg's other recommendations at that time (i.e., neuromodulatory medications and a TENS unit trial).  (*Id.*)  Thereafter, Plaintiff underwent one session of physical therapy. (Tr. 15, 292–93.)

In March 2008, Plaintiff returned to see Dr. Atkinson, after last seeing him in June 2006.  (Tr. 15, 290.)  Dr. Atkinson compared Plaintiff's MRI from 2006 with the most recent MRI and noted that Plaintiff's back condition appeared

---

[5]     Hemilaminectomy is a surgical procedure to alleviate the symptoms of an irritated or impinged nerve root in the spine.  *Hemilaminectomy*, Laser Spine Institute, http://www.laserspineinstitute.com/back_problems/back_surgery/types/ hemilaminectomy/ (last visited Dec. 17, 2012).

"markedly improved" on the newest MRI.  (*Id.*)  Consequently, Dr. Atkinson did not believe a surgical operation would improve Plaintiff's current symptoms.  (*Id.*)  Instead, Dr. Atkinson recommended non-surgical pain management to treat Plaintiff's symptoms.  (*Id.*)

In April 2008, Plaintiff returned to see Dr. Grogg and reported that he was not interested in new treatment protocols but was instead interested in merely monitoring his symptoms.  (Tr. 15, 287.)  Plaintiff reported that he had initiated janitorial work and was doing reasonably well.  (*Id.*)  Dr. Grogg observed that Plaintiff's symptoms had improved since Dr. Grogg saw him in mid-February 2008.  (Tr. 287.)  Plaintiff requested that Dr. Grogg formulate work restrictions so that he could enter vocational rehabilitation, which Dr. Grogg provided to him. (*Id.*)

That same day, Plaintiff underwent a consultative examination with Dr. Richard H. Rho, a pain management physician at the Mayo Clinic.  (Tr. 347–49.)  Dr. Rho noted that Plaintiff was a custodian, and Plaintiff denied that his occupation required heavy lifting.  (Tr. 347.)  However, Dr. Rho noted that Plaintiff's occupation required a fairly high level of physical functioning.  (Tr. 349.) On examination, Dr. Rho observed that Plaintiff had a normal gait and walked on his heels and toes without difficulty.  (Tr. 348.)  Dr. Rho further noted that while Plaintiff had slightly decreased deep tendon reflexes, they were symmetric.  (*Id.*) Dr. Rho also observed that Plaintiff had negative straight leg raising, no

allodynia[6] throughout his lumbosacral regions or lower extremities, reasonable lumbar spine range of motion in all directions, no spasms in the lumbosacral areas, and normal muscle mass and tone in his lower extremities.  (*Id.*) Nevertheless, Dr. Rho advised Plaintiff that, in light of his pain complaints, he would be "a good candidate for spinal cord stimulation."  (Tr. 349.)  Plaintiff informed Dr. Rho that he was "in the middle of several different legal matters regarding his worker's compensation status," and that, as a result, he wanted to conclude those matters prior to considering any treatment such as spinal cord stimulation.  (*Id.*)  In the meantime, Plaintiff wanted to proceed with conservative treatment measures.  (*Id.*)

In September 2008, Dr. Salmi, a state agency reviewing physician, reviewed the record and opined that Plaintiff could perform light level work (i.e., occasionally lift or carry up to twenty pounds, frequently lift or carry up to ten pounds, and stand, sit, or walk about six hours in an eight-hour workday) with the following postural limitations: frequent climbing of ramps and stairs and balancing; occasional stooping, kneeling, crouching, and crawling; and no climbing of ladders, ropes, or scaffolds.  (Tr. 295–96, 301.)  In October 2008, Dr. Mark, another state agency reviewing physician, reviewed the record and concurred with Dr. Salmi's assessment.  (Tr. 306–07.)

---

[6]     Allodynia is the experience of pain from stimuli that are not normally painful. *Definition of Allodynia*, MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey=25197 (last visited Dec. 17, 2012).

In November 2008, Plaintiff went to the Emergency Department at the Mayo Clinic with complaints of low back pain with radiation to his right lower leg. (Tr. 15, 318.)  Plaintiff reported that he was doing well until he coughed and sneezed several times over the weekend, which subsequently caused his radicular pain to recur.  (Tr. 318.)  Plaintiff was treated with medications and advised to follow up with Dr. Grogg.  (*Id.*)

In early January 2009, Plaintiff returned to see Dr. Grogg, after last seeing him in April 2008.  (Tr. 15, 378.)  Plaintiff reported that he was "not taking any pain medications."  (Tr. 378.)  On examination, Dr. Grogg found Plaintiff to have relatively full, pain-free range of motion of his cervical spine and all major joints and limbs and only mildly limited lumbar spine range of motion.  (Tr. 15, 378.)  Plaintiff demonstrated positive straight leg raising at 45 degrees on the right, but he had no significant tenderness upon palpation of his limbs or spine.  (Tr. 15–16, 378.)  While Plaintiff had some persistent findings, he was not interested in any new treatments.  (*Id.*)  Thus, Dr. Grogg instructed Plaintiff to follow-up as needed.  (Tr. 378.)

Later that same day, Dr. Grogg completed a Disorder of the Spine Treating Physician Data Sheet at the request of Plaintiff's attorneys.  (Tr. 354–64).  Dr. Grogg described Plaintiff as having granulation tissue displacing his right S1 nerve root.  (Tr. 355.)  Dr. Grogg noted that Plaintiff had a right L4-5 disk extrusion, which resulted in a right L4-5 laminectomy and disckectomy on March 24, 2004.  (*Id.*)  Dr. Grogg further noted that Plaintiff had no weakness or

muscle atrophy, but he had some limitation of lumbar range of motion, as well as some positive straight leg rising findings at 45 degrees on the right. (Tr. 356–57.) Dr. Grogg also noted that Plaintiff was "not currently using pain medications." (Tr. 355.) Nevertheless, Dr. Grogg assessed the following work limitations: Plaintiff would be able to occasionally lift or carry twenty pounds, frequently lift or carry less than ten pounds, stand or walk four hours in a six to eight- hour work day, occasionally bend or stoop, and should change his body position or posture every thirty minutes. (Tr. 357, 361.)

In late October 2009, over nine months since last seeking treatment, Plaintiff went to the Emergency Department at the Mayo Clinic with complaints of an exacerbation of low back pain after picking up twigs in his backyard. (Tr. 15, 374.) He reported that he began to ache with radiation into his right thigh and calf. (*Id.*) He rated his pain at a level three out of ten. (Tr. 376.) On examination, Plaintiff was observed to have no tenderness to palpation of his cervical, thoracic, or lumbar spine. (Tr. 15, 377.) Plaintiff was able to extend and flex at the hips without difficulty. (*Id.*) Plaintiff also had normal muscle strength in both his upper and lower extremities. (*Id.*) Plaintiff was given pain medications, advised to use either ice or heat on his back, and referred to make a follow-up appointment with Dr. Grogg or establish a primary care provider. (Tr. 15, 374–75.)

In early November 2009, Plaintiff saw Usha R. Kalava, MBBS, at Mayo Clinic's Primary Care Internal Medicine Division for a follow-up after his

Emergency Department visit.  (Tr. 372–73.)  Plaintiff reported that his low back pain was at a level one out of ten intensity.  (Tr. 372.)  Plaintiff also reported that he felt his pain was controlled with Flexeril and Didofenac.  (*Id.*)  On examination, Dr. Kalava observed Plaintiff to have equal muscle strength in both his upper and lower extremities, normal deep tendon reflexes except for a decrease in his right ankle reflex, and positive straight leg raising at 60 degrees bilaterally.  (Tr. 373.)

On November 20, 2009, Plaintiff saw Dr. Grogg and did not report any flare up, however, he wanted to discuss possible treatment options.  (Tr. 370.)  In particular, Plaintiff wanted to try a TENS unit.  (*Id.*)  A few days later, Plaintiff saw Omoloa Famuyide, a physical therapist at the Mayo Clinic, for instruction on how to apply a TENS unit.  (Tr. 368–69.)  At that consultation, Plaintiff reported that his pain was at a level one out of ten.  (Tr. 368.)  Thereafter, in mid-January 2010, Plaintiff saw Dr. Grogg and reported that he found the TENS unit helpful. (Tr. 15, 367.)

In late January 2010, Plaintiff saw Debra S. Coy, RN, CNP, at the Mayo Clinic for a pain clinic consultation.  (Tr. 386–88.)  Plaintiff reported that he was taking no medications.  (Tr. 386.)  On examination, Ms. Coy found Plaintiff to have a nonantalgic gait with an intact ability to heel-to-toe walk.  (Tr. 15, 388.) Plaintiff had normal gross motor strength in his lower extremities, mild tenderness across his mid low back at the L5 level, and normal deep tendon reflexes, however, he had positive straight leg raising (with reproduction of pain

in his left calf and right buttock). (*Id.*) Ms. Coy recommended that Plaintiff undergo an epidural steroid injection. (Tr. 388.)

In early February 2010, Plaintiff underwent the recommended epidural steroid injection at L5-S1. (Tr. 382.) At the end of February 2010, Plaintiff saw Ms. Coy and reported that the steroid injection seemed to help, but he was unable to quantify a specific percentage of benefit. (Tr. 384.) Ms. Coy noted that Plaintiff was rather upset that his disability applications had been turned down on three occasions, and he would therefore need to find some way to work. (Tr. 384, 417.) Plaintiff reported a pain level of one out of ten. (*Id.*) His physical examination findings were basically the same as those made the prior month. (Tr. 385.) He was given a prescription for a new pain medication called Nortriptyline. (*Id.*)

In March 2010, Plaintiff reported to Dr. Kalava that his back and lower extremity pain had been "well controlled" with Nortriptyline. (Tr. 415–16.) And in April 2010, Plaintiff similarly reported to Ms. Coy that Nortriptyline had dulled his pain, which he rated as a one out of ten. (Tr. 413.) Nevertheless, Plaintiff indicated he wished to pursue a spinal cord stimulation trial because he needed to return to work by the summer and wanted something in place so that he could work. (Tr. 414.)[7]

---

[7] The hearing before the ALJ occurred on April 14, 2010. (Tr. 24–49.)

In May 2010, Plaintiff saw Dr. Rho to discuss the possibility of a spinal cord stimulator trial. (Tr. 410–12.) On examination, Dr. Rho found Plaintiff to have brisk and symmetric deep tendon reflexes except at the right ankle, where they were absent; positive straight leg raising on the right, with no pain to palpation; no muscle spasms; and normal muscle mass and tone throughout. (Tr. 411.) Dr. Rho advised Plaintiff that a spinal cord stimulation trial would be appropriate and advised him of the steps that must be taken prior to such a trial. (*Id.*)

In late May 2010, Plaintiff underwent a repeat lumbar MRI that showed enhancement of the posterior L4-L5 disc with abnormal marrow signal in the adjacent endplates, which appeared slightly more prominent since Plaintiff's February 7, 2008 MRI. (Tr. 419.) The findings also showed a stable loss of height at L3-L4 and L5-S1 and a mild central annular tear at L3-L4 and. (*Id.*)

In June 2010, Plaintiff saw Dr. W. Michael Hooten, a physician at the Mayo Clinic Pain Clinic, to identify potential factors that could affect spinal cord stimulation. (Tr. 406–07.) Plaintiff reported that his current pain level was a one out of ten. (Tr. 407.) Plaintiff adamantly denied any current drug use. (Tr. 406.) At the end of the evaluation, Dr. Hooten informed Plaintiff that he would be ordering a urine toxicology screen. (Tr. 407.) At that point, Plaintiff told Dr. Hooten, "[y]ou're going to find something in it," explaining that he had used marijuana one week prior. (*Id.*) Plaintiff then reported that his disability claim would be denied and refused Dr. Hooten's offer to provide him chemical dependency services. (*Id.*)

Nine months later, in March 2011, Plaintiff went to the Emergency Department at the Mayo Clinic with complaints of an exacerbation of low back pain. (Tr. 395–402). Plaintiff reported that his pain level was normally a one to two in severity, however, that morning it was a seven out of ten. (Tr. 395.) He also reported that his pain was usually controlled with over-the-counter medications and the use of a TENS unit. (Tr. 395, 400.) Other than some back tenderness and positive straight leg raising, Plaintiff's lower extremity range of motion and strength were normal. (Tr. 398.) Plaintiff was given pain medications and advised to follow up with his primary care physician. (Tr. 399.)

Two months later, in May 2011, Plaintiff returned to the Mayo Clinic to see Dr. Grogg about prolotherapy.[8] (Tr. 393–94.) Plaintiff reported his current pain level as a one out of ten and that he had been maintaining his pain levels with the use of his TENS unit and no medications. (Tr. 393.) Dr. Grogg noted that Plaintiff had been evaluated for a potential spinal cord stimulator, however, it was not found to be appropriate. (*Id.*) On examination, Dr. Grogg observed Plaintiff to have mildly reduced lumbar range of motion, with tenderness over the lower paraspinal regions and sacroiliac joints and some pain complaints with hip range of motion testing, but normal gait and station, normal toe-to-heel walking, normal squatting, and normal bilateral lower extremity strength. (Tr. 393–94.) Dr. Grogg

---

[8]     Prolotherapy is a treatment for muscle and joint pain that involves repeated injections of an irritant solution, usually a sugar solution, into part of a joint. Brent A. Bauer, *Prolotherapy: Solution to Low Back Pain?* Mayo Clinic (Sept. 27, 2012), http://www.mayoclinic.com/health/prolotherapy/AN01330.

and Plaintiff discussed the use of Cymbalta, however, Plaintiff stated that he needed to determine if it was covered by his insurance.  (Tr. 394.)

## III.    Testimony at Administrative Hearing

Plaintiff, represented by counsel, testified before the ALJ on April 14, 2010. (Tr. 24–49.)  At the time of the hearing, Plaintiff lived in a one-story house with his mother and stepdad.  (Tr. 28, 35.)  Plaintiff testified that since 1995, he had held full-time positions for at least six months each as a production welder, an assembler welder, and a well driller.  (Tr. 25–26.)  Plaintiff stated that during the period of time since 1995, he had also worked as a part-time janitor for three months.  (Tr. 26.)

Plaintiff testified that he had last worked on April 16, 2006.  (Tr. 30.)  On that day, Plaintiff stated that his leg went numb, so he went to the doctor and was given work restrictions.  (*Id.*)  Plaintiff testified that when he notified his boss of the work restrictions, his boss told him that they "didn't have any job for a guy like this and you needed to go down to the unemployment office . . . ."  (*Id.*) Consequently, Plaintiff went to the unemployment office and collected unemployment for six months before filing a worker's compensation claim.  (*Id.*) For income, Plaintiff testified that he had a workmen's compensation lump sum settlement with a net value of $107,000.  (Tr. 29.)

When the ALJ asked what kept Plaintiff from working at the time of the hearing, Plaintiff replied that he had low-back pain and pain along the side of his right calf, which caused his calf muscle to vibrate all the time and cramp up at

night.  (Tr. 30.)  Plaintiff testified that he is able to drive fifteen minutes before he has to stop and rest or stretch.  (Tr. 31.)  Plaintiff stated that he could go longer, but he would need a tens unit.  (*Id.*)  Plaintiff also testified that he used a tens unit two times daily, which numbs his low back pain for two to three hours.  (*Id.*)  Two to three times per week, usually during the night or when he is sitting, his right leg cramps and he has to stand on it to get it "back to normal."  (Tr. 31–33.)  And after he stands on his right leg, he says his calf muscle aches for several hours and sometimes longer.  (Tr. 33.)  In addition, Plaintiff testified that he has difficulty putting on socks and shoes because he has to bend at the waist, which causes his low back to hurt and pain to shoot down the side of his right calf.  (Tr. 34.)

Plaintiff testified that he did his own laundry, made his own meals, and vacuumed occasionally, but he did not help with yard work.  (Tr. 35, 36.)  Plaintiff had to go downstairs to do his laundry, and he stated that it depends on if he is having a "good day or bad day" whether he throws each piece of clothing downstairs or puts the clothing in a basket and walks it downstairs.  (Tr. 35.)  Plaintiff described his pain level on a good day as "a one and it'll spike up to a five every now and then depending on . . . different movements."  (Tr. 41.)  Plaintiff described a bad day as "[v]ery excruciating where you can't do anything and nothing matters around you."  (*Id.*)  Plaintiff testified that he had good days "[p]robably three days a week" and "probably four" bad days.  (Tr. 42.)

Plaintiff testified that he used to ride a motorcycle and scuba dive, however, he does not partake in those activities anymore.  (Tr. 38.)  He stated that he liked to camp because "you can sit and you don't have to do anything." (*Id.*)  For exercise, Plaintiff testified that he tried to do stretches he learned from physical therapy at least three times per week.  (Tr. 36.)  He also stated that one exercise consisted of lying on his back and pushing the small of his back against the floor.  (Tr. 36–38.)  In addition, Plaintiff used to swim for exercise, but he stated he could not afford to anymore because of his limited income.  (Tr. 49.)

When the ALJ asked if Plaintiff was able to sit normally, he replied "[n]ot really" and stated that he could sit fifteen to twenty minutes without having to stand up, walk around, or stretch.  (Tr. 39)  Sitting with his back straight-up was the best position for him.  (Tr. 40.)  Alternatively, Plaintiff stated that he could only stand fifteen to twenty minutes without having to sit down.  (Tr. 39)

Plaintiff testified that he walked slowly, took small steps, and put more weight on his left leg.  (Tr. 40.)  He testified that he could "probably walk around a block and a half until" he needed to sit down.  (*Id.*)  The ALJ posed a hypothetical question to Plaintiff asking him how much time of an eight-hour shift he could spend on his feet either standing or walking at a job where he had absolute rights to sit and stand.  (*Id.*)  Plaintiff replied that he could possibly stand for half an hour and "pay the price later," which Plaintiff explained as possibly not standing at all the next day.  (Tr. 40–41.)

21

Plaintiff testified that he would not feel comfortable lifting or carrying more than twenty pounds. (Tr. 42.) When the ALJ asked how Plaintiff could bend, Plaintiff testified that "[b]ending's not good." (Tr. 43.) However, Plaintiff stated it was better if he bended at his knees and kept his sides and back straight. (Tr. 43–44.) The ALJ also asked Plaintiff about his arms, and Plaintiff testified that once or twice per day his pinkie fingers would tingle and he would experience neck pain. (Tr. 44.)

The ALJ asked Plaintiff whether he had any problems using his feet to operate foot controls, like the pedals of car, and Plaintiff stated that his right toe would cramp almost immediately if he extended it. (*Id.*) Plaintiff testified that he drove an automatic transmission and that he would not want to drive a standard transmission because "[i]t could possibly hurt" and he has not "driven a stick shift in a long time." (*Id.*)

Plaintiff testified that he did not get any relief from the injections he underwent at the Mayo Clinic. (Tr. 45.) He stated that the physical therapy he underwent at the Mayo Clinic also did not relieve his pain and sometimes made it worse. (Tr. 45–46.) Plaintiff stated that he was taking Nortriptyline and non-prescription magnesium pills. (Tr. 46.) Plaintiff took the magnesium pills to help his muscles and bones. (*Id.*) And he had been taking Nortriptyline for a month to a month and a half, but stated "[i]t really doesn't do anything." (*Id.*) Plaintiff testified that he has had a tens unit for about three to four months, which gave him low back pain relief for fifteen minutes to half an hour but did not relieve his

22

leg pain.  (Tr. 47.)  And he stated that he was going to be evaluated for an internal ten units that would be implanted in his back.  (*Id.*)

Plaintiff stated that he had been to vocational rehab and had started college, however, he only lasted a month and a half because his back went out.  (Tr. 48.)  He had graduated from high school, and he took regular classes there.  (*Id.*)  Further, he stated that cold weather affected him mentally, but he was not otherwise being treated for depression.  (*Id.*)

Bill Rutenbeck testified at the hearing as a vocational expert.  (Tr. 49–55.)  The ALJ asked him a hypothetical question regarding whether jobs existed that someone with Plaintiff's vocational profile could perform if limited to lifting up to twenty pounds occasionally and ten pounds frequently; standing four hours in an eight-hour workday; sitting for six hours; walking limited to one block at a time; no ladder climbing; occasional stair climbing, balancing, stooping, kneeling, crouching, or crawling; and occasional exposure to cold extremes or to hazards such as moving parts and heights.  (Tr. 50–51.)  The expert testified that Plaintiff's past work would not be possible, but that such a person could perform jobs such as a sewing machine operator (900 in-state jobs) or could work in sauderer production (1,300 in-state jobs).  (Tr. 51.)

In a second hypothetical, the ALJ asked whether jobs existed for the same individual described in the first hypothetical, however, limited to lifting ten pounds occasionally and five frequently.  (Tr. 52.)  The expert testified that such a person could perform jobs such as electronic inspection (4,000 in-state jobs), entry-level

customer service (6,000 in-state jobs), and security monitor (1,200 in-state jobs). (*Id.*)  Next, the ALJ asked whether any full-time jobs existed for the same individual described in the second hypothetical "plus unable to sustain an eight-hour workday."  (Tr. 53.)  The vocational expert responded that there would be no jobs that such a person could perform.  (*Id.*)

## IV.    The ALJ's Findings and Decision

On August 4, 2010, the ALJ issued a decision concluding that Plaintiff was not disabled as defined by the Social Security Act at any time from the alleged onset date of April 15, 2006, through the date of the decision,[9] and he therefore denied Plaintiff's application for disability insurance benefits.  (Tr. 18.)  The ALJ followed the five-step procedure as set out in the Code of Federal Regulations. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The Eighth Circuit Court of Appeals has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience)"; (4) "whether the claimant has the residual functional capacity ["RFC"] to perform his or her past relevant work"; and (5) if the ALJ finds that the

---

[9]     Plaintiff's earnings record showed that he had acquired sufficient quarters of coverage to remain insured through December 12, 2011.  (Tr. 11, 163.)

claimant is unable to perform his or her past relevant work then the burden is on the Commissioner "to prove that there are other jobs in the national economy that the claimant can perform." *Fines v. Apfel*, 149 F.3d 893, 894–95 (8th Cir. 1998).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of April 15, 2006, therefore meeting the requirement at the first step of the disability-determination procedure. (Tr. 12.) At step two, the ALJ found that Plaintiff had the following severe impairments: "degenerative disc disease of the lumbar spine, status post L4-5 disc extrusion and surgical resection in 2004; granulation tissue displacing the right S1 nerve root; and chronic pain." (Tr. 13.) The ALJ concluded that Plaintiff's anxious and upset demeanor in the context of denial of disability was non-severe because it did not "cause more than minimal limitations in [his] ability to perform basic mental work activities . . . ." (*Id.*) At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App. 1. (Tr. 14.) Specifically, the ALJ stated there was "insufficient evidence to support the severity of a listed musculoskeletal impairment." (*Id.*)

The ALJ found that Plaintiff had the RFC to perform sedentary work as defined in 20 CFR 404.1567(a) – lifting and carrying up to ten pounds occasionally and five pounds frequently; standing or walking four hours out of an eight-hour day; walking one block at time; sitting six hours out of an eight-hour day; occasional stair climbing, stooping, balancing, crouching, kneeling, crawling, exposure to cold extremes, moving parts, and heights; and no ladder climbing.

(*Id.*)  The ALJ made these findings after considering Plaintiff's symptoms, the testimony from the hearing, all medical opinions, and the entire record.  (Tr. 14, 16.)  The ALJ concluded that Plaintiff's "allegations of disabling pain and incapacitating limitations are not consistent with or supported by the objective medical record of treating and examining physicians."  (Tr. 14.)  Further, he stated that Plaintiff's overall functioning is inconsistent with a finding of disability because he "engages in regular household chores, social functioning with friends and family, activities including bicycle riding, playing video games, reading and occasional camping."  (Tr. 16.)

At step four, the ALJ adopted the vocational expert's conclusion and found that Plaintiff was unable to perform any past relevant work.  (*Id.*)  And at step five, the ALJ found that based on the vocational expert's testimony there are jobs that exist in significant numbers in the national economy that Plaintiff can still perform in light of his age, education, work experience, and RFC.  (Tr. 17.)  Thus, the ALJ concluded that a finding of "not disabled" was appropriate.  (*Id.*)

## DISCUSSION

### I.  Standard of Review

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of

not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006). "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Reed v. Sullivan*, 988 F.2d 812, 814 (8th Cir. 1993) (internal quotation marks omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001) (quoting *Beckely v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." *Gavin*, 811 F.2d at 1199. "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Id.* In reviewing the administrative decision, "'[t]he substantiality of evidence must take into account whatever in the record fairly

detracts from its weight.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second, that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

## II. Analysis of the ALJ's Decision

Plaintiff raises three issues in support of his motion for summary judgment. First, Plaintiff argues the ALJ's finding that Plaintiff's condition does not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, App. 1 § 1.04(A) is contrary to the medical evidence of the record. (Doc. No. 9, Mem. of Law Supp. Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") 13–14.) Second, Plaintiff argues that the ALJ failed to give due consideration to the opinion of Dr. Grogg that Plaintiff would need to change body position every thirty minutes. (*Id.* at 15–16.) Lastly, Plaintiff argues the ALJ's rejection of Plaintiff's testimony regarding his symptoms and their effect on his ability to perform work activities is not supported by substantial evidence. (*Id.* at 16–19.)

### A. Whether the ALJ's Finding that Plaintiff's Condition Did Not Meet or Equal Any Listed Impairments Is Contrary to the Medical Evidence in the Record

Plaintiff argues there is ample evidence in the record showing that he suffers from an impairment meeting the requirements of Listing § 1.04(A). (Pl.'s Mem. 14.) Listing § 1.04(A) states, in relevant part:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Part 404, Subpart P, App. 1, § 1.04(A).  Plaintiff contends that his medical history reflects multiple injuries to his lower back requiring surgery and various treatment modalities, and his long medical history of pain and sensory loss into his lower extremities are symptoms that the listing recognizes as associated with nerve root impingement.  (*Id.* at 14–15.)

Plaintiff also asserts that his medical history includes imaging studies confirming abutting, impinging, or displacing the S1 Nerve roots, as well as physical exams documenting numerous positive straight leg raise tests dating back to 2006.  (*Id.*)  Specifically, Plaintiff points to a questionnaire Dr. Grogg completed on January 9, 2009, in which he notes Plaintiff's positive straight leg rise findings of 45° on the right, limitation of lumbar spinal motion to 20° forward flexion and 30° extension, and MRI studies revealing "residual enhancing soft tissues, which displace the right S-1 nerve root posteriorly, and likely represents granulation tissue."  (Tr. 355–56.)  Plaintiff argues that the ALJ offered no explanation why the facts described by Dr. Grogg warranted a determination that Plaintiff's condition did not meet or medically equal the listing for disorder of the spine.  (Pl.'s Mem. 15.)

Defendant asserts that the ALJ properly evaluated the record evidence when finding that Plaintiff's condition did not meet or equal the requirements of any listed impairment and that Plaintiff retained the ability to perform sedentary level work.  (Doc. No. 14, Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") 15.)  Defendant asserts that Plaintiff cites to isolated findings made by

Dr. Grogg to show that he meets the requirements of Listing § 1.04(A) while failing to acknowledge the mild nature of these findings, since Defendant asserts that Dr. Grogg's opinion about Plaintiff's limitations is consistent with finding Plaintiff capable of performing light level work despite these findings. (*Id.* at 16.) Defendant also points out that Plaintiff fails to mention that no physician of record found his condition to be disabling or to meet the requirements of any listing. (*Id.*) In addition, Defendant asserts the record shows that Plaintiff did not have the requisite persistent findings required by Listing § 1.04(A) because most of his records showed only mild abnormalities; for example, the record shows that Plaintiff had infrequent exacerbations of symptoms, significant gaps in treatment, and frequently rated his pain as mild to moderate. (*Id.* at 17.)

In response, Plaintiff argues that Defendant overstates the opinions of Dr. Grogg by repeatedly asserting that Dr. Grogg opined Plaintiff could perform light level work. (Doc. No. 15, Pl.'s Reply Mem. to Def.'s Mot. for Summ. J. ("Pl.'s Reply") 1.) Instead, Plaintiff contends that Dr. Grogg's assessments of his physical abilities are best viewed as an interpretation of Plaintiff's maximum physical abilities, not as a recommendation that he can perform these activities on a consistent basis as required by competitive employment. (*Id.* at 3.) Additionally, Plaintiff asserts that since the ALJ chose to ignore or discount the reports and observations of Dr. Grogg, he was under a legal obligation to explain why. (*Id.* at 2.)

The ultimate determination of disability is a question for the ALJ, not the physician. *Samons v. Astrue*, 497 F.3d 813, 819 (8th Cir. 2007) (citing *Ellis v. Barnhart*, 392 F.3d 988, 994–95 (8th Cir. 2005)). In making that determination, an ALJ need not discuss every piece of evidence a claimant offers, and "failure to cite specific evidence does not indicate that such evidence was not considered." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)). Here, when determining whether Plaintiff's condition met or equaled the requirements of Listing § 1.04(A), the ALJ stated that "he reviewed the entire record and [found] insufficient evidence to support the severity of a listed musculoskeletal impairment." (Tr. 14.) On review of the record, this Court agrees with the ALJ.

Plaintiff relies on the findings in Dr. Grogg's questionnaire in which he noted Plaintiff's positive straight leg rise findings of 45° on the right, limitation of lumbar spinal motion to 20° forward flexion and 30° extension, and MRI studies revealing "residual enhancing soft tissues, which displace the right S-1 nerve root posteriorly." (Tr. 355–56.) But Plaintiff fails to acknowledge that Dr. Grogg also opines in the questionnaire that Plaintiff could perform various tasks (i.e., stand and/or walk for four hours in a six to eight-hour work day, lifting twenty pounds occasionally, lifting less than ten pounds frequently, and bending or stooping while carrying less than ten pounds occasionally), which is consistent with the ability to perform light level work. (Tr. 361.) Furthermore, Dr. Grogg examined Plaintiff on the same day he completed the questionnaire and found Plaintiff to

have "relatively full, pain-free range of motion of [his] cervical spine and all major joints and limbs," and only mildly limited lumbar spine range of motion.  (Tr. 15, 378.)

In addition to Dr. Grogg, the record shows that no other medical source who rendered an opinion found Plaintiff's condition to be disabling or to meet the requirements of any listing.  Examining neurosurgeon Dr. Atkinson found Plaintiff could work in a sedentary type job.  (Tr. 15, 288.)  State agency reviewing physician Dr. Salmi also reviewed the record and opined that Plaintiff could perform light level work.  (Tr. 295–96, 301.)  Dr. Mark, another state agency reviewing physician, reviewed the record and concurred with Dr. Salmi's opinion. (Tr. 306–07.)

The regulations instruct that physical findings over a period of time, and not simply isolated findings from one exam, must be considered.  20 C.F.R. Part 404, Subpart P, App. 1, § 1.00(D) ("Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation."); 20 C.F.R. Part 404, Subpart P, App. 1, § 1.00(H)(1) ("Musculoskeletal impairments frequently improve with time or respond to treatment; [t]herefore, a longitudinal clinical record is generally important for the assessment of severity and expected duration of an impairment . . . .").  Plaintiff's longitudinal clinical record shows that he did not have the requisite persistent findings required by Listing § 1.04(A), with most of his records showing only mild abnormalities, including no strength deficits, a normal

gait, mild limitations in range of motion (if any), and mild tenderness to palpation. For example, in early June 2006, Plaintiff saw Dr. Grogg regarding a deep ache in his posterior thigh and calf and right buttock. (Tr. 282.) Dr. Grogg found that while Plaintiff had a reduced reflex of his right calf muscle, there were no definite strength deficits. (*Id.*)

In Dr. Grogg's January 2009 questionnaire, he noted that Plaintiff had no limitation of cervical spine motion, weakness, or muscle atrophy. (Tr. 356–57.) In late October 2009, Plaintiff went to the Emergency Department at the Mayo Clinic with complaints of an exacerbation of low back pain after picking up twigs in his backyard. (Tr. 16, 374.) Upon exam, Plaintiff was observed to have no tenderness to palpation of his cervical, thoracic, or lumbar spine; he was able to extend and flex at the hips without difficulty; and he had normal muscle strength in both his upper and lower extremities. (Tr. 16, 377.) In early November 2009, Plaintiff saw Dr. Kalava for a follow-up after his Emergency Department visit. (Tr. 372–73.) Dr. Kalava observed Plaintiff to have equal muscle strength in both his upper and lower extremities and normal deep tendon reflexes except for a decrease in his right ankle reflex. (Tr. 373.)

In late January 2010, Plaintiff saw Debra S. Coy, RN, CNP, at the Mayo Clinic for a pain clinic consultation. (Tr. 386–88.) Ms. Coy found Plaintiff to have a nonantalgic gait with an intact ability to heel-to-toe walk, normal gross motor strength in his lower extremities, mild tenderness across his mid low back at the L5 level, and normal deep tendon reflexes. (Tr. 15, 388.) Plaintiff saw Ms. Coy

again the following month, and his physical examination findings were essentially the same as those made the prior month. (Tr. 385.) In May 2010, Plaintiff saw Dr. Rho to discuss the possibility of a spinal cord stimulator trial. (Tr. 410–12.) Dr. Rho found Plaintiff to have brisk and symmetric deep tendon reflexes (except at the right ankle, where they were absent), positive straight leg raising on the right, with no pain to palpation, no muscle spasms, and normal muscle mass and tone throughout. (Tr. 411.)

In March 2011, Plaintiff went to the Emergency Department with complaints of an exacerbation of low back pain. (Tr. 395–402.) Other than some back tenderness and positive straight leg raising, Plaintiff's lower extremity range of motion and strength were normal. (Tr. 398.) In May 2011, Plaintiff saw Dr. Grogg regarding prolotherapy. (Tr. 393–94.) Dr. Grogg observed Plaintiff to have mildly reduced lumbar range of motion, with tenderness over the lower paraspinal regions and sacroiliac joints and some pain complaints with hip range of motion testing, but normal gait and station, normal toe-to-heel walking, normal squatting, and normal bilateral lower extremity strength. (*Id.*)

Consistent with all medical source opinions that Plaintiff was not disabled, and with the mostly mild normal clinical examination findings, Plaintiff, throughout the relevant time, rated his pain as mostly mild to moderate. (Tr. 282, 284, 288, 368, 372, 376, 384, 393, 395, 407, 413, 417.) On November 23, 2009, Plaintiff rated his pain as a ten out of ten, however, his pain subsided to a one out of ten

the next day.  (Tr. 368.)  Indeed, most frequently, he rated his pain as a one out of ten.  (Tr. 368, 372, 384, 393, 407, 413, 417.)

The record also shows that Plaintiff had infrequent exacerbations of symptoms, as his symptoms were well-controlled with medications and other conservative measures, such as the use of a TENS unit.  (Tr. 367, 372, 393, 395–400, 415–16.)  And on several occasions Plaintiff reported taking no medications at all.  (Tr. 284, 378, 386, 393.)  In line with evidence that his symptoms were well-controlled, the record shows Plaintiff had significant gaps in treatment throughout the relevant time, including two nine-month periods of no treatment (Tr. 374, 378, 395–402, 407), and another period of a year and eight months of no treatment (Tr. 284, 288.)  In sum, substantial evidence in the record supports the ALJ's determination that Plaintiff did not meet or equal Listing § 1.04(A) because the physical findings consistent with the listing were intermittent.

**B.      Whether the ALJ Failed to Give Due Consideration to the Treating Physician's Assessed Limitation of a Sit/Stand Option**

Plaintiff argues the ALJ erred by rejecting as not medically warranted Dr. Grogg's recommendation that Plaintiff needs the option for a regular change in position.  (Pl.'s Mem. 16.)  Plaintiff asserts that the basis for the ALJ's finding was the belief that Plaintiff was not a surgical candidate and because he appeared to be alleviating pain with conservative care.  (*Id.*)  Plaintiff contends this reasoning disregards Plaintiff's testimony and extensive medical history,

which he asserts shows that he suffers chronic severe back pain and that all treatment modalities are only temporary. (*Id.*) In addition, Plaintiff argues that the ALJ ignored the fact that surgery had been considered but was not recommended because physicians did not believe it would relieve Plaintiff's symptoms. (*Id.*) Plaintiff also asserts that the ALJ gave no consideration to the evidence of nerve root compromise in Plaintiff's lower back that appears throughout his medical history and is supported by numerous MRI and imaging studies. (*Id.*) In response, Defendant asserts that Plaintiff's conclusion that the ALJ disregarded Dr. Grogg's opinion that Plaintiff required a sit/stand option every thirty minutes ignores the ALJ's finding that, even if Dr. Grogg's assessed limitation for changing positions every thirty minutes was incorporated into the ALJ's RFC finding, Plaintiff would still be able to perform a significant number of sedentary jobs. (Def.'s Mem. 18.)

In determining that a regular change in position was not medically warranted, the ALJ stated that he "thoroughly considered the opinion of Dr. Grogg" (Tr. 16), which indicated that Plaintiff "need[ed] to change body position or posture to less otherwise intractable pain" every thirty minutes. (Tr. 357.) However, the ALJ rejected Dr. Grogg's position because of "the absence of significant ongoing neurological findings, supported by nonantalgic gait and intact heel and toe walking in January 2010 . . . ." (Tr. 16.)

This Court concludes that the ALJ's decision to grant less weight to Dr. Grogg's opinion is supported by substantial evidence in the record as a

whole. A treating physician's opinion is typically entitled to controlling weight when it is "'well-supported by medically acceptable clinical and laboratory and diagnostic techniques'" and not inconsistent with other substantial evidence in the record. *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012–13 (8th Cir. 2000)). But "[a]n ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir. 2001). Importantly, courts reviewing an ALJ's decision "will disturb [that] decision only if it falls outside the available 'zone of choice.'" *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). "A decision is not outside that 'zone of choice' simply because [the court] may have reached a different decision had [it] been the fact finder in the first instance." *Id.*

The ALJ discounted the opinion of Dr. Grogg because his opinion that Plaintiff needed a change of body position every thirty minutes had no support within the objective record and Plaintiff's recent examinations showed few problems with walking and mostly normal test results. (Tr. 15, 388.) Aside from Dr. Grogg, no medical source determined that Plaintiff needed a regular change in position every thirty minutes. In fact, Plaintiff's medical record shows mostly mild abnormalities, including no strength deficits, a normal gait, mild limitations in range of motion (if any), and mild tenderness to palpation. (Tr. 282, 356–57, 373, 377–78, 385, 388, 394, 398, 411.) Further demonstrating that Plaintiff did

not have "significant ongoing neurological findings" (Tr. 16), the record shows Plaintiff had substantial gaps in treatment throughout the relevant time, including two nine-month periods of no treatment (Tr. 374, 378, 395–402, 407), and another period of a year and eight months of no treatment. (Tr. 284, 288.)

The ALJ reviewed the results of Plaintiff's January 2010 examination by Debra S. Coy, RN, CNP, which found Plaintiff to have a nonantalgic gait with an intact ability to heel-to-toe walk, normal gross motor strength in his lower extremities, mild tenderness across his mid low back at the L5 level, and normal deep tendon reflexes. (Tr. 15, 388.) The ALJ also noted that Plaintiff's overall functioning was not consistent with Dr. Grogg's opinion, citing Plaintiff's ability to "engage in regular household chores, social functioning with friends and family, and activities including bicycle riding, playing video games, reading and occasional camping." (Tr. 16.) In his report, the ALJ reasonably determined that Dr. Grogg's opinion that Plaintiff should change positions every thirty minutes was not supported by the objective record, based on assessments of other physicians and Plaintiff's activities. Thus, the ALJ's decision not to place controlling weight on Dr. Grogg's opinion is clearly within the "zone of choice" and, as such, should be affirmed.

Furthermore, the ALJ specifically asked the vocational expert to consider whether the inspector, customer service, and security monitor jobs the vocational expert had identified as consistent with the ALJ's sedentary RFC finding (with no sit/stand option) could still be performed if, pursuant to Dr. Grogg's opinion, the

individual needed to change positions every thirty minutes (in other words, jobs in which Plaintiff would not have to sit more than thirty minutes at a time).  (Tr. 53–54.)  The vocational expert responded that, even assuming a need to change positions every thirty minutes, the customer service job and security monitor job would still be available for such an individual.  (Tr. 52, 54.)[10]  While a hypothetical question posed to a vocational expert must relate with precision to all of the claimant's impairments, *Rappoport v. Sullivan*, 942 F.2d 1320, 1323 (8th Cir. 1991), "[t]estimony from a [vocational expert] based on a properly-phrased hypothetical question constitutes substantial evidence."  *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996).  This Court concludes that the hypotheticals posed to the vocational expert were proper.

Based on the above, Plaintiff's argument that the ALJ failed to give the proper weight to Dr. Grogg's opinion on Plaintiff's functional limitations fails and

---

[10]     The ALJ made a typographical error in his summary of the vocational expert's testimony.  While the ALJ indicated in his decision that the vocational expert testified the inclusion of a sit/stand option *at will* still allowed for the customer service and security guard jobs (Tr. 17), the administrative hearing transcript shows that the vocational expert testified that a sit/stand option *every thirty minutes* allowed for the customer service and security guard jobs (Tr. 54), while a sit/stand option *at will* would eliminate all jobs.  (Tr. 53.)  The ALJ's misstatement is of no consequence, however, as no doctor found Plaintiff needed a sit/stand option *at will*; rather, Dr. Grogg merely found Plaintiff required a sit/stand option *every thirty minutes.*  (Tr. 357.)  Again, with a sit/stand option every thirty minutes, the vocational expert testified that an individual such as Plaintiff would still be able to perform thousands of jobs, including customer service and security monitoring.  (Tr. 52, 54.)

the ALJ's RFC finding is supported by substantial evidence in the record as a whole.

**C.      Whether the ALJ Properly Evaluated the Credibility of Plaintiff's Subjective Complaints**

Plaintiff argues that the ALJ erred by finding his testimony that he experienced disabling pain inconsistent with the objective medical record and the opinions of the treating and examining physicians.  (Pl.'s Mem. 16.)  Plaintiff contends there is nothing conflicting between his description of his pain symptoms and the medical history cited by the ALJ.  (*Id.* at 19.)  In fact, Plaintiff asserts the references cited by the ALJ provide additional support for the fact that he was suffering chronic ongoing low back pain for which he was being continuously treated at the Mayo Clinic.  (*Id.*)  Plaintiff also argues there is no conflict between his description of his daily activities and his description of disabling pain.  (*Id.*)

Defendant asserts that in attempting to challenge the ALJ's credibility finding, Plaintiff cites to isolated aspects of his medical treatment and ignores the evidence that undermines his credibility.  (Def.'s Mem. 19.)  In support of this position, Defendant points out that every medical source of record who rendered an opinion found that Plaintiff was not disabled and could perform at least the work contemplated by the ALJ's RFC finding for a restricted range of sedentary work.  (*Id.*)  Furthermore, Defendant contends that the ALJ's finding that Plaintiff could perform a significant number of sedentary level jobs was consistent with

Plaintiff's own reports that his pain was mostly mild, evidence that Plaintiff's symptoms were well-controlled with conservative measures, significant gaps in Plaintiff's treatment, and Plaintiff's ability to engage in daily activities that are at least as strenuous as the work identified as consistent with the ALJ's RFC finding. (*Id.* at 20–21.)

In evaluating pain reports, the ALJ –

must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

1. the claimant's daily activities;

2. the duration, frequency, and intensity of the pain;

3. precipitating and aggravating factors;

4. dosage, effectiveness and side effects of medication; [and]

5. functional restrictions.

*Polaksi v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). "Complaints that are inconsistent with the evidence as a whole, including medical reports and daily activities, may be discredited by the ALJ." *Clark v. Chater*, 75 F.3d 414, 417 (8th Cir. 1996). "The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints." *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004) (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)). Although the ALJ must consider each *Polaski* factor, she need not discuss in her decision how

each factor relates to the claimant's credibility.  *Casey v. Astrue*, 503 F.3d 687, 695 (8th Cir. 2007) (citing *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004)). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination." *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003).  "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Baldwin v. Barnhart*, 349 F.3d 549, 558 (8th Cir. 2003) (citing *Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir. 1987)).

In accordance with *Polaski*, and contrary to Plaintiff's assertion, the ALJ gave full consideration to all the evidence presented regarding Plaintiff's complaints of pain.  The ALJ noted specific instances in the record where Plaintiff's activities after his alleged disability onset date appeared contrary to his complaints of disabling pain.  For example, in October 2009, Plaintiff felt well enough to pick up twigs in his backyard before his back began to ache.  (Tr. 16, 374.)  And Plaintiff's subsequent examination at the Mayo Clinic Emergency Department was "generally unremarkable" because Plaintiff was observed to have no tenderness to palpation of his cervical, thoracic, or lumbar spine; he was able to extend and flex at the hips without difficulty; and he had normal muscle strength in both his upper and lower extremities.  (Tr. 15, 377.)  The ALJ also noted that Plaintiff's overall daily activities—such as performing regular household chores, social functioning with friends and family, bike riding, playing

video games, reading, and occasional camping—were not consistent with his claims of disability.  (Tr. 16, 223, 225–27.)

In addition to considering incongruent facts in the record, Plaintiff's credibility is also diminished by the fact that Plaintiff primarily rated his pain as mild to moderate (Tr. 282, 284, 288, 368, 372, 376, 384, 393, 395, 407, 413, 417), and most frequently rated his pain as a one out of ten.  (Tr. 368, 372, 384, 393, 407, 413, 417.)  For example, on follow-up with Dr. Grogg in January 2009, the ALJ stated that Plaintiff "had relatively full and pain-free range of motion of the neck and all major joints and limbs."  (Tr. 15, 378.)  And further, the ALJ stated that Plaintiff appeared "to be alleviating [his] pain with conservative care," (Tr. 15) such as prescription and over-the-counter medications (Tr. 16, 46, 282, 283, 322, 324, 332, 335), the use of a TENS unit (Tr. 367, 372, 393, 395–400, 415–16), or no medications at all.  (Tr. 284, 378, 386, 393.)

Lastly, the various medical professionals who opined on Plaintiff's condition all concluded that Plaintiff could perform at least the work contemplated by the ALJ's RFC finding for a restricted range of sedentary work.  (Tr. 16.)  For example, the ALJ noted that neurosurgeon Dr. Atkinson found Plaintiff could perform sedentary work (Tr. 15, 288), and Dr. Grogg's and reviewing physicians Drs. Salmi and Mark's opinions were all consistent with Plaintiff performing light level work.  (Tr. 294–301, 305–07, 354–64.)

The ALJ thoroughly discussed the reasons for finding Plaintiff's subjective complaints of pain implausible and used the *Polaski* factors as the basis for this

44

evaluation.  As such, this Court concludes that the ALJ properly assessed the

evidence and that the ALJ's assessment of Plaintiff's credibility is supported by

substantial evidence in the record as a whole.

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.　Plaintiff's Motion for Summary Judgment (Doc. No. 8), be **DENIED**;

2.　Defendant's Motion for Summary Judgment (Doc. No. 13), be

**GRANTED**; and

3.　This case be **DISMISSED WITH PREJUDICE**, and judgment be

entered.

Date:  December 18, 2012　　　__*s/ Jeffrey J. Keyes*_____
　　　　　　　　　　　　　　　JEFFREY J. KEYES
　　　　　　　　　　　　　　　United States Magistrate Judge


Under D. Minn. Loc. R. 72.2(b), any party may object to this Report and
Recommendation by filing with the Clerk of Court, and serving all parties by
**January 2, 2013**, a writing which specifically identifies those portions of this
Report to which objections are made and the basis of those objections.  Failure
to comply with this procedure may operate as a forfeiture of the objecting party's
right to seek review in the Court of Appeals.  A party may respond to the
objecting party's brief within **fourteen days** after service thereof.  A judge shall
make a de novo determination of those portions to which objection is made.  This
Report and Recommendation does not constitute an order or judgment of the
District Court, and it is therefore not appealable to the Court of Appeals.